IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LORI A. HUBERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 16-cv-10041 |
| | ) |
| GANNETT CO., INC. and GANNETT SATELLITE INFORMATION NETWORK, LLC, | ) Honorable John Z. Lee |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |

**DEFENDANTS' BRIEF IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT**

Melissa A. Siebert
msiebert@bakerlaw.com
Bonnie Keane DelGobbo
bdelgobbo@bakerlaw.com
191 North Wacker Drive
Suite 3100
Chicago, Illinois 60606
Telephone:    312.416.6200
Facsimile:    312.416.6201

*Counsel for Defendants, Gannett Co., Inc. and
Gannett Satellite Information Network, LLC*

Defendants Gannett Co., Inc. ("Gannett Co.") and Gannett Satellite Information Network, LLC ("Gannett Satellite") (collectively, "Defendants") are entitled to summary judgment on Plaintiff Lori Hubers' ("Plaintiff") claims under the Illinois Equal Pay Act (Count I), federal Equal Pay Act (Count II), Title VII (Count III), Illinois Human Rights Act (Count IV), and Illinois Wage Payment and Collection Act (Count V).

## BACKGROUND

### I. Compensation

Gannett Satellite is a national media organization that does business as USA Today and is a subsidiary of Gannett Co. Plaintiff Lori Hubers ("Plaintiff") is a former female advertising sales employee of USA Today. Defendants' Local Rule 56.1 Statement of Facts ("SOF") ¶¶ 1-2. Plaintiff interviewed with John Marquardt ("Mr. Marquardt") for an Account Director position in USA Today's national integrated sales team, and later also interviewed with Michael Safran ("Mr. Safran") and a Human Resources employee. Mr. Marquardt was the Midwest Director of Integrated Sales for USA Today and reported to Mr. Safran, who was the Senior Vice President of Integrated Sales for USA Today. SOF ¶ 5. Plaintiff was hired for the position, began working on December 2, 2013, and reported directly to Mr. Marquardt. SOF ¶ 6.

Mr. Safran and USA Today's Human Resources department set Plaintiff's starting annual salary at $135,000, and she was eligible to receive an additional $90,000 in commission if she achieved 100% of her sales goals, making her total target annual compensation $225,000. Plaintiff also negotiated a $5,000 signing bonus. SOF ¶¶ 7-8. At the time Plaintiff accepted USA Today's offer, she thought "[i]t seemed like a fair offer" and "it seemed like a good opportunity." SOF ¶ 9. Plaintiff's target annual commission was later increased to $135,000, making her total target annual compensation $270,000. SOF ¶¶ 10.

Plaintiff had the highest target annual compensation, the highest commission potential, and the third highest base salary among all Account Directors across the country who were in USA Today's national advertising sales team and focused on brand sales. Plaintiff was paid more than three of the four men who held that position, and the person with the highest base salary was a woman. SOF ¶ 11. When Plaintiff voluntarily resigned from USA Today in July 2015, she accepted a base salary from her new employer "slightly lower than what I was making at USA Today" and believed it "was a good salary." SOF ¶ 12.

Joseph Martin ("Mr. Martin") is the only male employee who Plaintiff asserts was treated more favorably than her. SOF ¶ 13. Mr. Martin originally was hired by a subsidiary of Gannett Satellite called Sports Media Group, LLC ("SMG") in October 2012 to focus on selling sports advertising. John Schram ("Mr. Schram") and Andy Sippel made the decision to hire Mr. Martin, and Mr. Martin reported to Mr. Schram. SOF ¶ 14. Mr. Martin's base salary when he was hired by SMG was $190,000, and his commission target at 100% of goal was $95,000, for a total target compensation of $285,000. SOF ¶ 15. Mr. Schram and SMG's Human Resources department, which was separate from USA Today's Human Resources department, set Mr. Martin's salary based on his prior experience working for ESPN for 13 years, prior experience selling sponsorships, extensive list of client contacts and relationships, and the seniority of the position. SOF ¶¶ 16-17.

SMG operated separately and independently from the USA Today national integrated sales team and did not report to Mr. Safran. SMG sold sponsorships in addition to print and digital advertising. SOF ¶ 18. Advertising sales employees who worked in SMG generally had higher base salaries and overall compensation packages than sales employees on the USA Today national sales team because they were perceived to be specialists in sports advertising, which USA Today

perceived as having a greater growth potential than other types of advertising. SOF ¶ 19. Selling sports advertising is more challenging than selling other types of advertising because sports sellers have to deal with sanctioning bodies, licensing issues, and more conflicts of interest. SOF ¶ 20. Plaintiff never worked in SMG and agrees Mr. Martin had a different job than Plaintiff during the time that Mr. Martin worked in SMG. SOF ¶ 21. Plaintiff is not alleging her pay was discriminatory during the time Mr. Martin worked in SMG. SOF ¶ 28.

Around fall 2014 or early 2015, Randy Kilgore ("Mr. Kilgore"), the President of National Sales for Gannett, Co., decided to eliminate the sales leadership team in SMG as a cost-saving measure and to transfer direct sales representatives who had been working in SMG into the USA Today national sales team. SOF ¶ 22. As part of the restructuring, Mr. Martin was transferred into the USA Today national integrated sales team and assigned to report to Mr. Marquardt. Mr. Safran continued to head the national integrated sales team. SOF ¶ 23. Mr. Martin was expected to continue looking for sports-related growth opportunities after he began reporting to Mr. Marquardt, in addition to selling other categories of advertising. SOF ¶ 24. Mr. Kilgore did not reduce the compensation packages of Mr. Martin and the other former SMG employees when they were transferred into the USA Today national advertising sales team because he did not want them to quit. SOF ¶ 26. Although Mr. Marquardt did not know it at the time, Mr. Martin's base salary was actually significantly higher than Mr. Marquardt's base salary, even though Mr. Martin began reporting to Mr. Marquardt. SOF ¶¶ 29-30. Mr. Safran added a requirement to Mr. Martin's commission plan that in order for Mr. Martin to earn the full amount of his total target commission, 20 percent of Mr. Martin's sales had to come from sports revenue. Mr. Safran added this requirement because he wanted to leverage Mr. Martin's expertise in sports sales and there was a lack of expertise in the USA Today team with respect to sports sales at that time. SOF ¶ 27.

Around the time Plaintiff left USA Today, she first learned Mr. Martin had a higher base salary than she did at USA Today. SOF ¶ 53. She testified that her pay discrimination claims are based exclusively on the period of time after Mr. Martin began reporting to Mr. Marquardt around fall 2014 or early 2015. SOF ¶¶ 28.

**II.   Work Environment**

Plaintiff's claims against USA Today concern exclusively the following contentions: (1) she was paid less than Mr. Martin; (2) she was assigned to work on the Starbucks account; (3) she did not work in an enclosed office space and Mr. Martin did; (4) she had to record her vacation time and Mr. Martin did not; (5) she did not get to work from home as often as Mr. Martin; (6) she was not paid the full amount she was owed on her final commission. SOF ¶ 31.

USA Today had a "barter" agreement with Starbucks whereby Starbucks paid a certain amount in cash to advertise in the USA Today publication and then received a certain amount of free advertising in exchange for placing USA Today newspapers in Starbucks stores. SOF ¶ 32. The barter portion of an account does not generate any revenue. SOF ¶ 33. Plaintiff admits she understood her commission would be based only on net revenue. SOF ¶ 34. Plaintiff began working on the Starbucks account around summer 2014 because she asked to be assigned to the account, and even identified it as one of the top ten accounts she wanted to be responsible for. Plaintiff never asked to be removed from the Starbucks account. SOF ¶ 35. Plaintiff admits she has no evidence that she was assigned to work on the Starbucks account because she was a woman. SOF ¶ 36.

Plaintiff admits no one assigned Mr. Martin to work in an enclosed office space. Rather, as Plaintiff explained, "[h]e found an empty office and sort of squatted in there" when he was still working for SMG. SOF ¶ 37. Plaintiff was told she "could sit wherever I want, if I needed to

move around at an empty space or an empty cube." As far as Plaintiff was aware, there were no empty offices available. Plaintiff never asked anyone to be assigned to an office and never attempted to use an empty office. SOF ¶ 38. Mr. Martin was the only advertising salesperson who had an office. All other male and female advertising salespeople worked in cubicles like Plaintiff. Plaintiff admits she has no evidence that the reason she did not have an office was because she is a woman. SOF ¶ 39.

Mr. Marquardt instructed both Plaintiff and Mr. Martin to log their vacation time. SOF ¶ 40. Plaintiff logged her vacation time because Human Resources instructed her to do so when she was hired, Mr. Marquardt reminded her when she took time off, and Plaintiff did not want to break the rules. SOF ¶ 41. Plaintiff is not sure whether Mr. Marquardt or anyone else actually reviewed the time she logged to confirm that she was logging it properly. SOF ¶ 42. Plaintiff believes at least one female advertising sales employee who she viewed as her peer was not logging her vacation days. SOF ¶ 43.

Mr. Marquardt told Plaintiff when she started working at USA Today that she could work from home as long as she still got her job done. According to Plaintiff, Mr. Marquardt never complained to Plaintiff about Plaintiff working from home and never told her she could not work from home. SOF ¶ 44. During the time Plaintiff and Mr. Martin were both reporting to Mr. Marquardt, Plaintiff observed Mr. Martin work from home about ten times. Plaintiff also worked from home occasionally, and Plaintiff admits another woman who reported to Mr. Marquardt "worked from home all the time." SOF ¶¶ 45-46. Plaintiff admits she has no evidence that she could not work from home because she is a woman. SOF ¶ 47.

Plaintiff observed Mr. Martin going to golf outings and baseball games with Mr. Marquardt. Plaintiff never asked to join. Plaintiff thinks some of these were client entertainment

events paid from Mr. Martin's client entertainment budget, and it is possible they all were. SOF ¶ 48. Plaintiff used her own client entertainment budget to host frequent dinners, lunches, manicures, and pedicures outside the office. Mr. Marquardt never objected or gave any negative feedback about Plaintiff being out of the office for client events. SOF ¶ 49. Mr. Marquardt was available to attend Plaintiff's client meetings if Plaintiff requested and accompanied her on a trip to St. Louis for a client meeting. SOF ¶ 50. Mr. Martin did not attend Plaintiff's client events because "[t]hey were my [Plaintiff's] clients. So he didn't come to my events." SOF ¶ 51.

### III. Plaintiff's Final Commission Payment

Plaintiff admits she understood her commission would be based on actual net revenue the company received for advertising she sold and that "[n]et revenue is billed and recognized revenue, less subsequent billing adjustments and discounts, agency commissions, billing adjustments, and bad debt." SOF ¶ 54. Plaintiff admits she did not send invoices to clients or personally keep track of such invoices, and she relied on a different department to handle all client invoicing. Likewise, Plaintiff admits clients did not send payments for advertising directly to her, and she did not personally keep track of what clients were actually paying USA Today. SOF ¶ 55. Actual billed revenue numbers were maintained in the company's billing systems and available through a reporting tool called Aspire. Plaintiff did not have access to Aspire. SOF ¶ 56.

Plaintiff contends the net revenue number credited to her for her final commission was too low. SOF ¶ 57. Brett Rumfelt, who calculated Plaintiff's final commission, used the net revenue information from Aspire reports in calculating commission payments. SOF ¶ 58. During her deposition, Plaintiff was unable to identify any inaccuracies in the actual billed revenue numbers reflected on the Aspire report for her final commission payment and asserted she would need to review her SalesForce report to identify any inaccuracies. SOF ¶ 59. Plaintiff admits SalesForce

was a tool Plaintiff used to track her own advertising sales projections and did not contain actual billed revenue numbers for advertising. SOF ¶ 60. Based on her more than 30 years of experience in sales positions with about twelve different companies, Plaintiff knows advertising salespeople are not paid commissions based on what they personally project to sell. SOF ¶ 61. She agrees commissions are based on net revenue actually generated from accounts, and that is the only way she has ever been paid during her entire career in sales. SOF ¶ 62.

Even after receiving her Salesforce report, Plaintiff cannot identify any facts indicating Defendants actually received revenue for any advertising that should have been included in her final commission calculation but was not included. SOF ¶ 63. Plaintiff admits she has no evidence that any additional advertising actually ran or that any client was actually billed for any advertising that was not included her final commission payment. SOF ¶ 64.

### IV. Administrative Exhaustion

Plaintiff filed a charge of discrimination with the EEOC that was deemed cross-filed with the Illinois Department of Human Rights ("IDHR"). The EEOC issued a Notice of Right to Sue to Plaintiff, but Plaintiff did not submit a copy of the EEOC's determination to the IDHR within 30 days and did not receive a right-to-sue-letter from the IDHR. SOF ¶¶ 65-67. Plaintiff filed this lawsuit less than 365 days after the EEOC issued its right-to-sue letter. SOF ¶ 68.

## ARGUMENT

"Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Lauderdale v. Illinois Dep't of Human Servs.*, 876 F.3d 904, 907 (7th Cir. 2017) (citing Fed. R. Civ. P. 56(a).)

### I. Defendants Are Entitled To Summary Judgment On Plaintiff's Equal Pay Act (Counts I and II) and Sex Discrimination (Counts III and IV) Claims.

#### A. Legal Standards

Both the federal and Illinois Equal Pay Acts prohibit an employer from paying employees differently based on sex. 29 U.S.C. § 206(d)(1); *accord* 820 ILCS 112/10(a). Courts apply the same standards when evaluating claims under both statutes. *Bowbin v. Bulkmatic Transp., Inc.*, No. 07C0260, 2007 WL 3374402, at *5 n.2 (N.D. Ill. Nov. 13, 2007). To establish a prima facie case of discrimination, "an employee must demonstrate a difference in pay for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Lauderdale*, 876 F.3d at 907 (internal quotation marks omitted). "If this requirement is satisfied, the burden of proof shifts to the employer to prove some neutral factor that explains the discrepancy in salary." *Id.* Differences in pay are not discriminatory if they are based on "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1); *accord* 820 ILCS 112/10(a).

While the state and federal Equal Pay Acts concern only compensation, Title VII and the Illinois Human Rights Act ("IHRA") more broadly prohibit discrimination with respect to compensation, terms, conditions, or privileges of employment. 42 U.S.C. § 2000e-2; 775 ILCS 5/2-102. Illinois has expressly adopted federal Title VII standards for evaluating employment discrimination claims under the IHRA. *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 178–79, 545 N.E.2d 684, 687–88 (1989). To establish a prima facie case, "a plaintiff must present sufficient evidence that she was a member of a protected class, she performed reasonably on the job in line with the employer's legitimate expectations, she was subjected to an adverse employment action, and similarly situated employees of the opposite sex were treated more favorably." *Lauderdale*, 876 F.3d at 910. The employer then must "articulate a 'legitimate, nondiscriminatory reason'" for the different treatment. *Id.* "If the employer articulates a

4835-0192-7019.4               8

nondiscriminatory reason…the plaintiff must prove that the employer's justification was pretext for a decision made on prohibited criteria (here, sex)," and "[i]f she cannot, her claim fails." *Id.* "On summary judgment, the plaintiff must present evidence that supports an inference that the employer was intentionally dishonest when it gave its nondiscriminatory reason." *Id.* A plaintiff cannot discharge this burden merely by making "bald assertions" that a pay disparity was based on gender. *Markel v. Bd. of Regents of Univ. of Wisconsin Sys.*, 276 F.3d 906, 913 (7th Cir. 2002).

### B. Plaintiff Cannot Show The Pay Differential Was Based On Sex.

Even assuming arguendo that Plaintiff can establish a prima facie case of pay discrimination,[1] Defendants are entitled to summary judgment because it is undisputed that Plaintiff's pay was not based on sex. The Seventh Circuit "has repeatedly held that a difference in pay based on the difference in what employees were previously paid is a legitimate 'factor other than sex'" for purposes of Title VII and Equal Pay Act claims. *Lauderdale*, 876 F.3d at 908 (collecting cases). *See also, e.g.*, *Wernsing v. Dep't of Human Servs.*, 427 F.3d 466, 468-69 (7th Cir. 2005); *Serratore v. Harrah's Operating Co.*, No. 05 C 3524, 2007 WL 178438, at *6 (N.D. Ill. Jan. 19, 2007) ("The Seventh Circuit has concluded—on several occasions—that prior wages are a 'factor other than sex' such that an employer's decision to pay an employe[e] a salary because of his or her salary at his or her previous job is not unlawful under the Equal Pay Act." (internal quotation marks omitted)).

As Plaintiff admits, Plaintiff's and Mr. Martin's respective starting compensation were set by different decision-makers, while Plaintiff and Mr. Martin worked for different and independent entities, and while Mr. Martin had a different job than she did. Plaintiff admits that at the time she was hired into the USA Today national sales team in December 2013, she considered her

---

[1] Defendants contest that Mr. Martin was similarly situated to Plaintiff but are not raising that issue here.

4835-0192-7019.4                              9

compensation package to be "a fair offer" and "a good opportunity." Indeed, Plaintiff was one of the most highly compensated Account Directors who focused on brand sales in USA Today's national advertising sales team. Plaintiff made more than three of the four men who held that position, and the person with the highest base salary was a woman. Mr. Martin's salary and target commission were set in 2012 when he was hired by SMG, an organization that generally had higher base salaries and overall compensation packages because USA Today perceived sports advertising to have a greater growth potential and wanted to recruit specialists in that area. Mr. Martin's starting salary was based on his prior experience working for ESPN and selling sponsorships, extensive list of client contacts and relationships, and the seniority of the position.

Plaintiff is only alleging her pay was discriminatory during the period of time after Mr. Martin was transferred to the USA Today national sales team and reassigned to report to Mr. Marquardt around the fall of 2014 or early 2015. Mr. Martin's reassignment occurred because the company decided to eliminate the sales management employees in SMG as a cost-saving measure and to integrate SMG's direct sellers into the USA Today national sales team. Although the former SMG employees generally had higher salaries, the company decided not to reduce their compensation after the move because it did not want them all to quit. Consequently, Mr. Martin's salary and target commission were kept the same after the move—even though that meant Mr. Martin earned more than both Plaintiff and Mr. Marquardt, his new boss.

In short, Mr. Martin's pay once he transferred into the national sales team was based on his prior salary from SMG, and was kept the same because the company did not want all the former SMG direct sellers to quit. Courts in this Circuit have repeatedly entered summary judgment in favor of the employer based on similar evidence. *See Lauderdale*, 876 F.3d at 911 (entering summary judgment in favor of employer on Title VII and Equal Pay Act claims where evidence

showed that "budget concerns" and "prior salaries caused the pay discrepancy"); *Golla v. Office of Chief Judge of Cook Cty.*, 875 F.3d 404, 407–08 (7th Cir. 2017) (entering summary judgment in favor of employer where evidence showed that two employees' salaries were set by different decision-makers in different departments before employees transferred into same department); *Serratore v. Harrah's Operating Co.*, No. 05 C 3524, 2007 WL 178438, at *5–6 (N.D. Ill. Jan. 19, 2007) (entering summary judgment in favor of employer where evidence showed that salary differential was based on employee's pay at previous job and employee's efforts to negotiate higher salary). Defendants are entitled to summary judgment on Plaintiff's Equal Pay Act claims (Count I and II) on Plaintiff's sex discrimination claims based on pay (Count III and IV).

### C. Plaintiff Cannot Show She Experienced Sex Discrimination With Respect To Any Other Terms, Conditions, Or Privileges Of Employment.

None of Plaintiff's remaining complaints rise to the level of an adverse employment action. Plaintiff complains she did not like working on a Starbucks account, she worked in a cubicle, she recorded her vacation time, she did not often work from home, and she did not attend golf or baseball games with Mr. Marquardt. "'While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action.'" *Markel*, 276 F.3d at 911 (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)). In *Markel*, the Seventh Circuit held that being "denied 'better' equipment, the ability to travel and make presentations, and removed from certain accounts that caused her not to receive bonuses…do not amount to actionable adverse employment actions." *Markel*, 276 F.3d at 911-12. The *Markel* court noted that losing a telephone and cubicle, being denied reimbursement for travel expenses, and being required to complete an undesirable task had all previously been held not to rise to the level of an adverse employment action. *Id.* (collecting cases). Aside from her compensation which was not discriminatory for the reasons addressed above, Plaintiff's remaining

complaints are simply "differences in office aesthetics between employees" that "standing alone…are not readily quantifiable losses Title VII was meant to redress." *Id.* at 912.

Moreover, Plaintiff cannot establish Mr. Martin was treated more favorably with respect to logging vacation time, working from home, and attending client events. Mr. Marquardt instructed both of them to log their vacation time, and Plaintiff does not know whether anyone actually reviewed her entries. Likewise, Mr. Marquardt told Plaintiff she could work from home, Plaintiff did so occasionally, and another woman reporting to Mr. Marquardt worked from home all the time. Similarly, Mr. Marquardt was available to attend both Plaintiff's and Mr. Martin's client events if requested and attended at least one out-of-state client meeting with Plaintiff.

Furthermore, any alleged differences between Plaintiff and Mr. Martin were for legitimate, non-discriminatory reasons. Plaintiff admits she worked on the Starbucks account because she asked to be assigned to the account and never asked to be removed from it. Just as with every other account—and consistent with Plaintiff's experience at a dozen different companies over more than 30 years in sales—Plaintiff earned commission on only the portion of the account that generated net revenue. Plaintiff admits Mr. Martin worked in an enclosed office space because he found an empty one and "squatted" there. Plaintiff was told she could use any available space and worked in a cubicle like every other male and female advertising salesperson aside from Mr. Martin because she never noticed an empty office, never attempted to use an empty office, and never asked anyone to be assigned to an office. Plaintiff logged her vacation time—even though she claims other women and men were not doing so and she did not know whether anyone actually checked what she was logging—because she had been instructed to do so and did not want to break the rules. To the extent Mr. Marquardt and Mr. Martin spent more time together outside the office, "socializing with someone who is not a member of a protected class does not demonstrate bias

against those who are in a protected class." *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006).

In short, Plaintiff cannot establish a prima facie case of sex discrimination with respect to her miscellaneous complaints (Counts III and IV) because she cannot show anything amounted to an adverse employment action and or that she was treated less favorably. Moreover, even if she could establish a prima facie case, any differences were for non-discriminatory reasons.

### D. Plaintiff Failed To Exhaust Administrative Remedies Under The IHRA.

Plaintiff's IHRA claims fail for the additional and independent reason that Plaintiff failed to exhaust her administrative remedies. The IHRA requires administrative exhaustion before filing suit. *See, e.g.*, *Rabe v. United Air Lines, Inc.*, 971 F. Supp. 2d 807, 819–20 (N.D. Ill. 2013). Obtaining a right-to-sue notice from the EEOC "does not serve as a substitute for a final order from the IDHR." *Egan v. Huntington Copper Moody & Maguire, Inc.*, No. 12 C 9034, 2015 WL 1396187, at *3 (N.D. Ill. Mar. 24, 2015). Where, as here, a discrimination charge was filed with the EEOC and deemed cross-filed with the Illinois Department of Human Rights ("IDHR"), "the complainant must submit a copy of the EEOC's determination [to the IDHR] within 30 days after service of the determination by the EEOC on complainant." 775 ILCS 5/7A-102(A-1)(1).[2] Moreover, the complainant cannot file a lawsuit until either (1) IDHR issues a right-to-sue notice or (2) IDHR fails to issue a final report within 365 days of filing the charge, a time period that is tolled until the EEOC issues its determination on a cross-filed charge. 775 Ill. Comp. Stat. Ann. 5/7A-102(A-1)(1) (tolling), (D)(3)-(4) (IDHR's issuance of final decision), (G)(2) (365 days).

Here, it is undisputed that Plaintiff did not submit a copy of the EEOC's determination on her charge of discrimination to the IDHR within 30 days after service of the determination by the

---

[2] Amendments to the IHRA not relevant here went into effect on September 8, 2017 and June 8, 2018. The version in effect from July 13, 2012 to September 7, 2017 is the version that governs Plaintiff's claims.

EEOC on Plaintiff. Moreover, it is undisputed that Plaintiff did not receive a right-to-sue-letter from the IDHR prior to filing suit, and that she filed her lawsuit in state court less than 365 days after the EEOC issued its right-to-sue letter. Consequently, she has not exhausted her administrative remedies, and Defendants are entitled to summary judgment on her IHRA claim (Count IV). *See, e.g.*, *Rabe*, 971 F. Supp. 2d at 819-20 (entering summary judgment in favor of employer where plaintiff filed suit before receiving right-to-sue letter from IDHR); *Nickerson v. US Airways, Inc.*, No. 15 C 2970, 2016 WL 3563807, at *6 (N.D. Ill. July 1, 2016) (dismissing IHRA claims where plaintiff failed to obtain right-to-sue letter prior to filing suit); *Copeling v. Illinois State Toll Highway Auth.*, No. 12 C 10316, 2014 WL 540443, at *4–5 (N.D. Ill. Feb. 11, 2014) (dismissing IHRA claims where plaintiff filed suit before receiving right-to-sue letter and less than 365 after filing charge); *Hankins v. Best Buy Co.*, No. 10 CV 4508, 2011 WL 6016233, at *5–6 (N.D. Ill. Dec. 2, 2011) (dismissing IHRA claims where plaintiff failed to submit documentation to IDHR within statutory time limits).

## II. Defendants Are Entitled To Summary Judgment On Plaintiff's Illinois Wage Payment And Collection Act ("IWPCA") Claim (Count V).

The IWPCA requires employers to pay compensation to employees in accordance with any "employment contract or agreement between the 2 parties." 820 ILCS 115/2. Plaintiff's IWPCA claim is based on her contention that she was not paid the full amount she was owed for her final commission because the net revenue amount credited to her during her final quarter with the company was too low. However, Plaintiff always understood only billed and recognized net revenue would be included in her commission calculations. Plaintiff was not involved in the billing or payment process and has never been able to identify any evidence indicating the net revenue numbers credited to her were inaccurate. Instead, she simply contends her final commission payment was incorrect because her projection of her commission, based on her own advertising

sales projections she had entered into a program called SalesForce, was different than the amount actually paid to her. Plaintiff admits, however, that SalesForce was simply a tool she used to track her own sales projections and did not contain actual billed revenue numbers. Plaintiff further admits that in her more than 30 years of experience in sales, she has never been paid commissions on what she projects to sell or on anything other than net revenue.

It is well settled that "inferences relying on mere speculation or conjecture will not suffice" to avoid summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-07 (7th Cir. 2009). Plaintiff's speculation that her commission must be wrong because she projected it to be higher is consequently insufficient at the summary judgment stage. Moreover, it is undisputed that Plaintiff did not have any agreement to be paid commissions based on her own sales projections—and in fact had an agreement to be paid based only on actual billed net revenue. Thus, Defendants are entitled to summary judgment on Plaintiff's IWPCA claim. *See, e.g.*, *Hess v. Bresney*, 784 F.3d 1154, 1161–63 (7th Cir. 2015) (entering summary judgment in employer's favor on IWCPA claim where employee failed to establish that employer made any "unequivocal promise" to calculate bonuses as plaintiff contended); *Rakos v. Skytel Corp.*, 954 F. Supp. 1234, 1240 (N.D. Ill. 1996) (entering summary judgment in employer's failure on IWPCA claim where employee failed to show he was owed the commission he was seeking).

## CONCLUSION

The undisputed facts demonstrate that any differences in compensation and treatment between Plaintiff and a male coworker were for legitimate, non-discriminatory reasons that had nothing to do with sex, Plaintiff failed to exhaust state administrative remedies, and Plaintiff's final commission was paid in accordance with the terms of her commission plan. Defendants are entitled to summary judgment.

Dated: July 10, 2018

Respectfully submitted,

BAKER & HOSTETLER LLP

By: /s/*Melissa A. Siebert*
Melissa A. Siebert
msiebert@bakerlaw.com
Bonnie Keane DelGobbo
bdelgobbo@bakerlaw.com
191 North Wacker Drive
Suite 3100
Chicago, Illinois 60606
Telephone: 312.416.6200
Facsimile: 312.416.6201

*Counsel for Defendants,Gannett Co., Inc. and Gannett Satellite Information Network, LLC*

4835-0192-7019.4            16

## **CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that on July 10, 2018, a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent to all parties registered on this Court's ECF system by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/*Melissa A. Siebert*

4835-0192-7019.4