# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| LORI A. HUBERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 16 C 10041 |
| | ) |
| GANNETT CO., INC., & | ) |
| GANNETT SATELLITE | ) Judge John Z. Lee |
| INFORMATION NETWORK, LLC, | ) |
| | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION & ORDER

Lori Hubers filed this lawsuit against Defendants Gannett Co., Inc., and Gannett Satellite Information Network, LLC (collectively, "Gannett"), arising out of her former employment as an advertising salesperson for USA Today. Hubers alleges she experienced sex discrimination and unequal pay in violation of the Illinois Equal Pay Act, 820 Ill. Comp. Stat. 112/1 *et seq.* ("IEPA"), the federal Equal Pay Act, 29 U.S.C. § 206(d), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Illinois Human Rights Act ("IHRA"), 775 Ill. Comp. Stat. 5/1-101 *et seq.* She further claims that Gannett withheld a portion of her final commission payment in violation of the Illinois Wage Payment and Collection Act ("IWPCA"), 820 Ill. Comp. Stat. 115/1 *et seq.* Gannett has moved for summary judgment. For the reasons stated herein, Gannett's motion is granted in part and denied in part.

**Factual and Procedural Background**[1]

Lori Hubers is a female former advertising sales employee of USA Today. Defs.' LR 56.1(a) Stmt. ("Defs.' SOF") ¶ 1, ECF No. 88. USA Today is published by Gannett.[2] *Id.* ¶ 2; Pl.'s LR 56.1(b) Stmt. Add'l Facts ("Pl.'s SOF") ¶ 2, ECF No. 102-1. Hubers worked for Gannett from December 2013 to July 2015. Defs.' SOF ¶¶ 6, 52.

Hubers was interviewed by John Marquardt, the Midwest Director of Integrated Sales for USA Today, and his boss Michael Safran, the Senior Vice President of Integrated Sales for USA Today. *Id.* ¶ 5. She was then hired as an "Account Director" for USA Today's national sales team, where she reported to Marquardt. Pl.'s LR 56.1(b) Resp. ¶ 6, ECF No. 121.

Safran set Hubers's compensation: a base salary of $135,000 and the possibility of an additional $90,000 in commission if she achieved 100% of her sales goals. Defs.' SOF ¶ 8. In 2014, her target commission increased to $135,000. *Id.* ¶ 10. And by the time Hubers left Gannett in 2015, her base salary had increased to $137,000. Pl.'s SOF ¶ 15.

---

[1] The following facts are undisputed or deemed admitted except where otherwise noted.

[2] Hubers and Gannett dispute which of the two Defendants employed Hubers. *See* Defs.' SOF ¶ 2; Pl.'s SOF ¶¶ 2, 4–10. Their dispute centers on which Gannett entity owns or operates USA Today; yet neither side has set forth evidence clarifying which entity actually paid or otherwise employed Hubers. *See* Defs.' LR 56.1(b) Resp. ¶¶ 2, 4–10, ECF No. 124. Prior to trial, Gannett should file a motion *in limine*, with supporting exhibits, addressing this dispute.

Joseph Martin was hired a year before Hubers by a Gannett subsidiary called Sports Media Group, LLC ("SMG"). Defs.' SOF ¶ 14. SMG operated independently from the USA Today national sales team. *Id.* ¶ 18. When he was hired by SMG, Martin's base salary was $190,000, with a target commission of $95,000. *Id.* ¶ 15. Martin's salary, which was set by an SMG manager, John Schram, was based on his prior experience working for ESPN for 13 years and selling sponsorships, his "extensive" list of client contacts and relationships, and "the seniority of the position." *Id.* ¶¶ 16–17. Because of the perceived specialized nature of the sports-related advertising work at SMG, advertising sales employees at SMG generally had higher base salaries and compensation packages than sales employees in the USA Today national sales team. *Id.* ¶ 19.

Martin, while an SMG employee, worked at USA Today's Chicago office with Hubers. *Id.* ¶ 37. At some point during his tenure there, Martin moved himself into an empty office space. *Id.* Nobody assigned Martin to work in the office space, and Marquardt, who was not Martin's supervisor, had no role in Martin's decision to do so. Defs.' LR 56.1(b) Resp. ¶ 18.[3] Hubers, by contrast, worked in a cubicle, where the noise level was "tough." Pl.'s SOF ¶ 18. Hubers never asked to move into an office, and agreed she was told that she could sit "wherever [she] want[ed]." Pl.'s LR

---

[3] Hubers contends that "[f]urther discovery since Plaintiff's deposition disclosed Martin was assigned an office by the office manager." Pl.'s LR 56.1(b) Resp. ¶ 37. But Hubers does not cite any evidence in support of this assertion, so the Court will not consider it. *See* Local Rule 56.1(b)(3)(B).

56.1(b) Resp. ¶ 38. It did not independently occur to Marquardt to move Hubers into an office space after Martin took one. Defs.' LR 56.1(b) Resp. ¶ 18.

In the summer of 2014, Marquardt assigned USA Today's account with Starbucks to Hubers upon her request. Pl.'s LR 56.1(b) Resp. ¶ 35. The Starbucks account was primarily a "barter account," meaning that Starbucks purchased $6 million in advertising but paid only $1 million in cash revenue, with the remaining $5 million paid through an in-kind arrangement with USA Today. Defs.' SOF ¶ 32; Defs.' LR 56.1(b) Resp. ¶ 24. Because of the arrangement, Hubers could receive credit for only $500,000 in commissionable revenue from the account. Defs.' LR 56.1(b) Resp. ¶ 24. Hubers states that she was unaware when she sought the account that it was far more labor-intensive than the commissions it generated. Pl.'s LR 56.1(b) Resp. ¶¶ 34–35; Pl.'s SOF ¶¶ 24–25. Marquardt did not personally help Hubers with the Starbucks account. Defs.' LR 56.1(b) Resp. ¶ 26.

Sometime between September 2014 and January 2015, Randy Kilgore, the President of National Sales for Gannett, decided to eliminate the sales team at SMG and move Martin into an Account Director position in the national sales team. Pl.'s LR 56.1(b) Resp. ¶ 22; Defs.' LR 56.1(b) Resp. ¶ 13. Kilgore, who was senior to both Schram (who had set Martin's compensation) and Safran (who had set Hubers's compensation), decided not to decrease Martin's salary to match Hubers's because he did not want Martin to quit. Defs.' SOF ¶ 26. Nor did Kilgore increase Hubers's salary to match Martin's. *See* Pl.'s LR 56.1(b) Resp. ¶ 26. Upon his transfer,

4

Martin was expected to continue seeking "sports-related growth opportunities" in addition to selling other types of advertising. Defs.' SOF ¶¶ 24, 27.[4]

After Martin was transferred into the USA Today national team, Marquardt became his direct supervisor in addition to continuing to supervise Hubers. Defs.' SOF ¶ 23. At that point, Hubers says, Marquardt began treating Martin more favorably than he treated her with respect to various working conditions, such as working from home and logging vacation time. *See* Pl.'s SOF ¶¶ 16–17.[5] Furthermore, Martin frequently went to outings such as golfing and baseball games with Marquardt, some of which might have been client events. Defs.' SOF ¶ 48. Marquardt did not invite Hubers to attend such events. Pls.' LR 56.1(b) Resp. ¶ 48. Hubers acknowledges, however, that she had her own client entertainment budget and used it to host frequent client meals and other events. Defs.' SOF ¶ 49.

Hubers resigned from USA Today in July 2015. *Id.* ¶ 52. When she left, Hubers received a final commission payment of $12,085.61, which reflected that she had met only 68% of her sales quota for the second quarter of 2015. Pl.'s SOF ¶ 37. Hubers believed she had reached a higher percentage of her sales quota and therefore

---

[4] Hubers disputes this assertion, but cites only her own declaration and attached exhibits, none of which call into question the fact that Martin was asked to continue focusing on sports-related advertising. *See* Pl.'s LR 56.1(b) Resp. ¶¶ 24, 27.

[5] Gannett disputes the admissibility of evidence supporting Hubers's claims regarding this differential treatment. *See* Defs.' LR 56.1(b) Resp. ¶¶ 16–17. The Court generally agrees with Gannett that this evidence is inadmissible, *see infra* Section II.

5

was entitled to a higher commission payment. *Id.* Gannett disputes this assertion. Defs.' LR 56.1(b) Resp. ¶ 37.

Commissions were paid out of net revenue attributable to a salesperson as opposed to sales goals, a fact of which Hubers was aware. Defs.' SOF ¶ 54. Revenue numbers were maintained in Gannett's billing systems and in a tool called Aspire, to which Hubers did not have access. *Id.* ¶¶ 55–56. Hubers did have access to another source of sales data—her "dashboard" from a system called Salesforce, which contained a comparison of numbers titled "Quota" and "Closed Rev." Pl.'s SOF ¶ 37; Pl.'s Ex. I, ECF No. 102-5.[6] Hubers states that Salesforce was used along with Aspire to calculate commissions. Pl.'s LR 56.1(b) Resp. ¶ 58; *see* Pl.'s SOF ¶¶ 21, 37; Pl.'s Ex. XIII, Rumfelt Dep., at 14–15, 22–26, ECF No. 102-2. Gannett disputes this assertion and the claim that Salesforce contains actual revenue numbers. Defs.' SOF ¶ 60; Defs.' LR 56.1(b) Resp. ¶ 37.

After she left Gannett, Hubers sent a photo, purportedly of her Salesforce dashboard for the second quarter of 2015, to Brett Rumfelt, the Gannett employee in charge of calculating commissions. Pl.'s SOF ¶ 37; Pl.'s Ex. I. In the photo, the total "Closed Rev" column showed approximately $1.14 million, which equals approximately 81% of Hubers's "Quota" of approximately $1.41 million. Pl.'s SOF ¶ 37; Pl.'s Ex. I.

---

[6]     Hubers has submitted an "Exhibit I" (Roman numeral), ECF No. 102-1, and an "Exhibit I" (capital letter), ECF No. 102-5. All references herein are to "Exhibit I" (capital letter), ECF No. 102-5, unless otherwise noted.

6

During her deposition in this case, which occurred in September 2017, Hubers was unable to identify any sales not credited to her final commission payment. Nor could she identify any inaccuracies in the revenue numbers supporting her final commission. Defs.' SOF ¶¶ 59, 63–64. But after her deposition, Hubers received updated discovery from Gannett regarding her sales (which she had previously moved to compel). Pl.'s LR 56.1(b) Resp. ¶¶ 59, 63–64; *see* Minute Entry of Oct. 4, 2017, ECF No. 51; Pl.'s 1st Mot. Compel, ECF No. 40. Gannett then served interrogatories on Hubers in late October 2017, asking her to identify any accounts or sales missing from her revenue calculations. Defs.' SOF ¶ 63. In response, Hubers stated that "[m]issing from the commission payments received were BP Amoco, ESPN and Starbucks. The specifics requested are not in Plaintiff's possession or control—rather Plaintiff has submitted requests for documents . . . that may provide such specifics." *Id.*; Defs.' Ex. P, Pl.'s 2d Set Interr. Responses ¶ 1, ECF No. 88-17. In March 2018, Magistrate Judge Gilbert granted in part Hubers's second motion to compel, ordering Gannett to produce another subset of Hubers's sales documents. Order, ECF No. 83. Hubers now states that she believes that a sale she made for $101,490 to BP Corporate is missing from her sales credit summary. Pl.'s SOF ¶ 37; *see* Hubers Decl. ¶¶ 20–21, ECF No. 102-4; Pl.'s Ex. N, ECF No. 102-5; Pl.'s Ex. O, ECF No. 102-5.[7]

---

[7] Gannett disputes the admissibility of Hubers's declaration testimony to this effect, as well as the supporting exhibits. *See* Defs.' LR 56.1(b) Resp. ¶ 37. These arguments are incorrect, as will be discussed. *See infra* Section III.

## **Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Shell v. Smith*, 789 F.3d 715, 717 (7th Cir. 2015). To survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012). The evidence considered for summary judgment "must be admissible if offered at trial, except that affidavits, depositions, and other written forms of testimony can substitute for live testimony." *Malin v. Hospira, Inc.*, 762 F.3d 552, 554–55 (7th Cir. 2014). The Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013).

Moreover, Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Zander v. Orlich*, 907 F.3d 956, 959 (7th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The moving party has the initial burden of establishing that there is no genuine issue of material fact. *See Celotex*, 477 U.S. at

322. Once the moving party has sufficiently demonstrated the absence of a genuine issue of material fact, the nonmoving party must then set forth specific facts showing there are disputed material facts that must be decided at trial. *See id.* at 321–22.

## Analysis

**I.     Equal Pay Act Claims (Counts I & II)**

Hubers argues that her base salary, which was lower than Martin's, violated the Illinois and federal Equal Pay Acts.[8] Under these laws, an employee may raise a *prima facie* case of pay discrimination based on sex by demonstrating "a difference in pay for 'equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Lauderdale v. Ill. Dep't of Human Servs.*, 876 F.3d 904, 907 (7th Cir. 2017) (quoting 29 U.S.C. § 206(d)(1)). If the employee meets this standard, the burden of proof shifts to the employer to prove that a neutral factor explains the discrepancy, such as (1) a seniority system, (2) a merit system, (3) a system which measures earnings by quantity or quality of production, or (4) a "differential based on any other factor other than sex." *Id.* (quoting 29 U.S.C. § 206(d)). "The justification need not be a 'good reason,' but merely a gender-neutral one." *Warren v. Solo Cup Co.*, 516 F.3d 627, 630 (7th Cir. 2008).

---

[8]     The IEPA and the federal Equal Pay Act are evaluated using the same standards. *See Bowbin v. Bulkmatic Transp., Inc.*, No. 07 C 0260, 2007 WL 3374402, at *5 n.2 (N.D. Ill. Nov. 13, 2007).

9

Here, Gannett contends that Hubers's base salary was lower than Martin's because of a "factor other than sex"—namely, the fact that Martin's salary in the USA Today national sales team was based on his previous salary at SMG. The Seventh Circuit has concluded that prior wages are a valid "factor other than sex" justifying a pay disparity. *See Lauderdale*, 876 F.3d at 908; *Wernsing v. Dep't of Human Servs.*, 427 F.3d 466, 468 (7th Cir. 2005). Here, Gannett points out, and Hubers does not dispute, that base salaries at SMG were generally higher than base salaries in the USA Today national sales team. Furthermore, it is undisputed that different decisionmakers set Hubers's salary as opposed to Martin's, and at different times. While Safran set Hubers's compensation package when she was hired in 2013, Schram set Martin's upon his hire at SMG in 2012. What is more, Kilgore made the decision to keep Martin's salary at the same level when Martin transferred to the national sales team. And the undisputed evidence shows that Kilgore's decision not to lower Martin's salary was not based on his sex or Hubers's, but on the fact that Kilgore did not want Martin to quit.

Hubers contends that prior wages should not factor into salary-setting decisions, citing a recent decision of the Ninth Circuit sitting *en banc*. *See Rizo v. Yovino*, 887 F.3d 453 (9th Cir. 2018) (*en banc*), *vacated on unrelated grounds sub. nom Yovino v. Rizo*, ___ S. Ct. ___, 2019 WL 886486 (U.S. Feb. 25, 2019) *(per curiam)*. In *Rizo*, the Ninth Circuit held that "prior salary alone or in combination with other factors cannot justify a wage differential" because, otherwise, employers could

10

"capitalize on the persistence of the wage gap and perpetuate that gap *ad infinitum*." *Id.* at 456–57. But unless and until the U.S. Supreme Court adopts the Ninth Circuit's view, this Court must follow the Seventh Circuit's holdings in *Lauderdale* and *Wernsing*, which are to the contrary. *See Lauderdale*, 876 F.3d at 908; *Wernsing*, 427 F.3d at 468.[9]

Alternatively, Hubers argues that, even if Gannett was not required to lower Martin's salary, it should have increased her salary to match Martin's. "Logically," she argues, "if an employer must pay equal wages, and is prohibited from decreasing those of any employee [*see* 29 U.S.C. § 206(d)(1)], it is expected—indeed required—that employers will increase the wages of the employee who is underpaid." Pl.'s Resp. Mot. Summ. J. at 5, ECF No. 98. While this reasoning may have some appeal, it is contrary to the holdings in *Lauderdale* and *Wernsing*; in neither case was the employer required to raise the lower-paid employee's salary. *See Lauderdale*, 876 F.3d at 908; *Wernsing*, 427 F.3d at 467–68. Undeterred, Hubers contends that these decisions are inapposite, because the employers in both cases were subject to bureaucratic constraints that prevented them from increasing the salary of the lower-paid employee. *See Lauderdale*, 876 F.3d at 908; *Wernsing*, 427 F.3d at 467–68. But the court in *Wernsing* expressly rejected Hubers's argument, *see* 427 F.3d at 467–

---

[9] Hubers also points to a bill introduced in the Illinois General Assembly that would prohibit employers from considering past wages under the IEPA. From the information provided by Hubers, however, it appears the bill has failed. *See* Bill Status of HB4163, www.ilga.gov/legislation/BillStatus.asp?DocNum=4163&GAID=14&DocTypeID=HB&SessionID=91&GA=100 (last visited Feb. 8, 2019).

68, and *Lauderdale* made abundantly clear that prior salary alone—irrespective of the use of a pay scale—is sufficient to support a pay differential. *See Lauderdale*, 876 F.3d at 908–09. Hubers has not cited any cases in this circuit supporting her theory that her salary should have been increased, nor has the Court located any.

The undisputed evidence shows that Martin's base salary was higher than Hubers's, not because of sex, but because of his prior salary at SMG. Accordingly, Gannett is entitled to summary judgment as to Hubers's claims of disparate pay premised upon the Illinois and Federal Equal Pay Acts.

## II.   Title VII & IHRA Claims (Counts III & IV)

Hubers next claims that she suffered work-based discrimination based on her sex, pointing to the pay disparity between herself and Martin, as well as to the differences in treatment she says she experienced at the hands of Marquardt. Title VII makes it unlawful for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of . . . sex." 42 U.S.C. § 2000e-2(a)(1).[10] To prove a claim of sex discrimination, a plaintiff must point to evidence that, considered as a whole, would "permit a

---

[10]   Courts evaluate claims under the IHRA using the same standards as Title VII. *See Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 n.39 (7th Cir. 2016). *Zaderaka v. Ill. Human Rights Comm'n*, 545 N.E.2d 684, 687 (Ill. 1989).

reasonable factfinder to conclude" that the plaintiff's sex caused an adverse employment action. *Ortiz v. Werner Enters.*, 834 F.3d 760, 765 (7th Cir. 2016).[11]

Gannett contends that most of the treatment of which Hubers complains—criticism about working from home, being told to log vacation hours, not being moved into an office, and not being invited to client events—are not adverse employment actions. *See Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002) ("[N]ot everything that makes an employee unhappy is an actionable adverse action.") (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)). This is true enough. *See Minor v. Centocor, Inc.*, 457 F.3d 632, 634 (7th Cir. 2006) (explaining that "being subject to criticism and close supervision" are the "ordinary incidents of employment rather than adverse actions"); *Markel*, 276 F.3d at 911 (concluding that the plaintiff did not suffer an adverse action from being denied "better" equipment, the ability to travel and make presentations, or removed from accounts that caused the plaintiff not to receive bonuses); *Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001) (holding that negative performance reviews, a

---

[11] Hubers does not indicate whether she seeks to prove her claim of sex discrimination through the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or through some other framework. The Court applies the standard laid out in *Ortiz*, which instructs district courts to look at the totality of evidence in the case without "separating 'direct' from 'indirect' evidence [or] proceeding as if they were subject to different legal standards," *Ortiz*, 834 F.3d at 765, but does not otherwise "alter [t]he burden-shifting framework created by" *McDonnell Douglas*. *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

13

change in job title, an increased travel distance, and loss of a telephone or cubicle did not constitute adverse actions).

Still, it is clear that Hubers *did* suffer at least one adverse employment action, if not several. She was paid less than Martin; furthermore, she contends that she was "saddled" with the Starbucks account, which resulted in lower commissions, whereas Martin was not assigned any similar "barter" accounts. *See* Pl.'s Resp. Mot. Summ. J. at 7. Hubers argues that because it was easier for Martin to earn commissions, and because his base salary was higher, he was guaranteed to net significantly more for less work. Considering the entire record and construing all disputed facts in Hubers's favor, *see Ortiz*, 834 F.3d at 765, these conditions, which affected Hubers's pay, are sufficient to qualify as adverse employment actions. *See Porter v. City of Chi.*, 700 F.3d 944, 954 (7th Cir. 2012).

To the extent that Hubers suffered an adverse employment action, Gannett nevertheless argues that the record is devoid of any evidence that these actions were taken on account of Hubers's sex. With this, the Court agrees. First, as already established, different decisionmakers set Hubers's and Martin's respective salaries, based on individualized decisions about their past experience and past wages. *See Lauderdale*, 876 F.3d at 911 (concluding that past salaries were a legitimate, non-discriminatory reason for a pay disparity). All of the other differential treatment, upon which Hubers relies, resulted from actions (or inactions) attributed to Marquardt; yet, Marquardt did not have a hand in setting Martin's base salary. *See*

14

*Moreland v. Nielsen*, 900 F.3d 504, 507–08 (7th Cir. 2018) (explaining that discriminatory treatment cannot be shown where different decisionmakers were responsible for different treatment). And, although Marquardt did have a role in assigning commission-paying accounts, his decision to assign the Starbucks account to Hubers was at Hubers's own request. This is a legitimate, non-discriminatory reason. *See Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 685–86 (7th Cir. 2014) (noting that an employee's hours were reduced based on his own request for vacation days, not for any discriminatory reason). And Hubers never asked to be removed from the Starbucks account, even after she learned how labor-intensive it would be.

Furthermore, Gannett correctly points out that some of Hubers's evidence is inadmissible for purposes of summary judgment. First, Hubers relies on the declaration of a coworker, Carlyn Morris, who states that Martin was "almost always absent from his office on Thursday, Friday, and Monday," but that whenever Hubers would work from home, Marquardt would complain about her absence. *See* Pl.'s SOF ¶¶ 16–17; Morris Decl. ¶¶ 9, 12, ECF No. 122. Morris's statement about Marquardt's complaints is inadmissible hearsay. *See Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) ("To be considered on summary judgment, evidence must be admissible at trial . . . . If the evidence is inadmissible hearsay, the courts may not consider it."). And Hubers did not disclose Morris's declaration to Gannett during discovery, rendering it inadmissible in its entirety pursuant to Rule 37(c)(1). Second, Hubers relies on her own declaration, in which she explains that Martin told

15

her he never logged his vacation time, despite the requirement that he do so. *See* Pl.'s SOF ¶ 17; Hubers Decl. ¶¶ 22. This too is inadmissible hearsay. *See Cairel*, 821 F.3d at 830.

Of the admissible evidence, there is nothing that suggests that Hubers and Martin were treated differently, or if they were, that the difference was due to sex. *See Ortiz*, 834 F.3d at 765. Rather, the undisputed evidence shows that Marquardt asked *both* Martin and Hubers to record their vacation time; Hubers acknowledges that she does not know if Marquardt checked to see if her hours were logged. Further, even if Marquardt approved of Martin working from home more than he approved of Hubers doing so, there is no evidence that this decision was based on Hubers's sex instead of some other factor, or that it was related to the amount that Hubers was paid. The same is true for Marquardt's decisions to join Martin in extracurricular activities. *See Merrillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006) ("[S]ocializing with someone who is not a member of a protected class does not demonstrate bias against those who are in a protected class."). Similarly, although Martin was allowed to work in an office while Hubers continued working in a cubicle, she points to no evidence showing that Marquardt had any role in assigning offices or allowing Martin to use the office. Indeed, at the time this incident occurred, Martin was still an employee of SMG and did not even report to Marquardt.

The record thus does not support a conclusion that any adverse action was taken against Hubers because of her sex. *See Ortiz*, 834 F.3d at 765.[12]

Accordingly, Gannett is entitled to summary judgment as to Hubers's claims of sex discrimination under Title VII and the IHRA.[13]

## III. IWPCA Claim (Count V)

For her final claim, Hubers disputes the amount of her final commission payment. The IWPCA requires employers to pay employees in accordance with the terms of their employment agreements and to pay the "final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee." 820 Ill. Comp. Stat. 115/5. According to Hubers, there is a dispute of fact as to whether her final commission payment accounted for all of the revenue she earned in the second quarter of 2015. She points to the photo of her Salesforce dashboard, which shows a higher dollar amount for "Closed Rev" than the revenue that Gannett said was credited to her final commission; she also points out a sale she made to BP Corporate that was not included in her commission calculation. Gannett discounts the

---

[12] Nor do these frustrations rise to the level of "severe and pervasive" offensive conduct required for a hostile-work-environment claim based on sex. *See Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018) (explaining that a hostile work environment is a type of adverse employment action); *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016) (concluding that criticism and overwork do not raise an inference of a workplace "permeated with intimidation, ridicule, and insult" as required to show a hostile work environment).

[13] The Court therefore need not address Gannett's argument that Hubers failed to exhaust her claims under the IHRA.

information from Salesforce, contending that the undisputed evidence shows that Salesforce did not contain actual billed revenue numbers, and that only billed revenue was used to calculate commissions. Additionally, Gannett argues that Hubers cannot rely on the BP Corporate sale, because she failed to disclose her reliance on that information in her post-deposition interrogatory response.

First, Gannett overstates the evidence with respect to Salesforce. Admittedly, Gannett points to evidence that actual billed revenue numbers were contained in Aspire, to which Hubers lacked access. *See* Defs.' SOF ¶ 56. But Hubers has offered evidence that Rumfelt used Salesforce when calculating commission payments. *See* Pl.'s LR 56.1(b) Resp. ¶ 58; *see* Pl.'s Ex. XIII, Rumfelt Dep. at 14–15, 21–24. And Hubers has pointed to evidence that Salesforce contained a comparison of her "Quota" versus "Closed Rev," which a reasonable juror could conclude bore some relation to the revenue numbers supporting Hubers's commission. *See* Pl.'s SOF ¶ 37; Hubers Decl. ¶ 15; Pl.'s Ex. I. Accordingly, a genuine dispute of fact exists concerning the difference between the commission percentage credited to Hubers (68%) versus the percentage (81%) shown in the screenshot of Hubers's Salesforce dashboard.

The evidence regarding the BP Corporate sale also creates a genuine dispute of fact. The record contains evidence that Hubers made a sale to BP Corporate in March 2015 in the amount of $101,490, *see* Pl.'s SOF ¶ 37; Hubers Decl. ¶ 21; Pl.'s Ex. O, and that this sale was not included on her "sales credit summary" for the second quarter of 2015. *See* Pl.'s SOF ¶ 37; Hubers Decl. ¶ 20; Pl.'s Ex. N. A

18

reasonable juror could conclude that this omission affected Hubers's final commission payment.

Gannett disputes the admissibility of Hubers's evidence regarding her sale to BP Corporate, contending that Hubers failed to disclose that evidence in her post-deposition interrogatory response. But Hubers responded to the interrogatory by stating that "[m]issing from the commission payments received were BP Amoco . . . ." Defs.' Ex. P, Pl.'s 2d Set Interr. Responses ¶ 1, ECF No. 88-17. Furthermore, Hubers had to move to compel Gannett to produce sales information a *second* time after this interrogatory response, and it is unclear exactly when during this process Hubers received the documents upon which she now relies. *See* Pl.'s 2d Mot. Compel, ECF No. 72. What is more, even if Hubers delayed in disclosing the evidence of the BP Corporate sale to Gannett, this delay could not have prejudiced Gannet, since the evidence was in Gannett's possession to begin with. This situation is therefore dissimilar to the cases cited by Gannett, in which the late-disclosed evidence was previously unknown to the opposing party. *See, e.g.*, *King v. Ford Motor Co.*, 872 F.3d 833, 837–38 (7th Cir. 2017) (upholding the decision to strike a declaration from a previously non-disclosed witness); *Farmer v. DirectSat USA, LLC*, No. 08 CV 3962, 2013 WL 12334777, at *4 (N.D. Ill. Oct. 17, 2013) (striking an expert's damages calculation that was not previously disclosed).

Accordingly, a genuine dispute of fact exists, and Gannett's motion for summary judgment as to Hubers's IWPCA claim is denied.

## **Conclusion**

For the reasons provided, Gannett's motion for summary judgment is granted as to Counts I—IV, but denied as to Count V. A status hearing is set for 4/3/19 at 9:15 a.m.

**IT IS SO ORDERED.**  ENTERED  3/11/19

_____
**John Z. Lee**
**United States District Judge**